# Illinois Official Reports

## Appellate Court

---

### *AUI Construction Group, LLC v. Vaessen*, 2016 IL App (2d) 160009

---

| | |
|---|---|
| Appellate Court Caption | AUI CONSTRUCTION GROUP, LLC, Plaintiff-Appellant, v. LOUIS J. VAESSEN, in His Capacity as Trustee of the Louis J. Vaessen Trust Dated 6/24/2003 ½ Interest; CAROL A. VAESSEN, in Her Capacity as Trustee of the Carol A. Vaessen Trust Dated 6/24/2003 ½ Interest; GSG 7, LLC; CLIPPER WINDPOWER, LLC; POSTENSA WIND STRUCTURES US, LLC; ROCK RIVER READY MIX, INC.; ILLINOIS TRUCK AND EQUIPMENT COMPANY, INC.; CUMMINGS ELECTRICAL, INC.; KR WIND, INC., d/b/a Mammoet Wind, Inc.; UNKNOWN OWNERS; and NONRECORD CLAIMANTS, Defendants (Louis J. Vaessen, in His Capacity as Trustee of the Louis J. Vaessen Trust Dated 6/24/2003 ½ Interest; Carol A. Vaessen, in Her Capacity as Trustee of the Carol A. Vaessen Trust Dated 6/24/2003 ½ Interest; GSG 7, LLC; Clipper Windpower, LLC; Postensa Wind Structures, US, LLC; Rock River Ready Mix, Inc.; Illinois Truck and Equipment Company, Inc.; Cummings Electrical, Inc.; Unknown Owners; and Nonrecord Claimants, Defendants-Appellees). |
| District & No. | Second District<br>Docket No. 2-16-0009 |
| Filed | November 9, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Lee County, No. 14-CH-38; the Hon. Daniel A. Fish, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Carolyn L. Morehouse, Chad J. Shifrin, and Daniel S. Brennan, of Laurie & Brennan LLP, of Chicago, for appellant.

Riccardo A. DiMonte and Ryan R. Van Osdol, of DiMonte & Lizak, LLC, of Park Ridge, for appellees Louis J. Vaessen and Carol A. Vaessen.

Douglas E. Lee, of Ehrmann, Gehlbach, Badger, Lee & Considine, LLC, of Dixon, for appellee GSG 7, LLC.

James E. Morgan, of Howard and Howard, of Chicago, for appellee Clipper Windpower, LLC.

No brief filed for other appellees.

John S. Mrowiec and Timothy R. Conway, of Conway & Mrowiec, of Chicago, for *amicus curiae* Associate General Contractors of America *et al.*

Garrett L. Boehm, Jr., and Nicholas R. Lykins, of Johnson & Bell, Ltd., of Chicago, and Eric B. Travers, of Kegler Brown Hill & Ritter Co., LPA, of Columbus, Ohio, for *amicus curiae* American Subcontractors Association, Inc.

Eugene Grace and Gene Grace, of Washington, D.C., *amicus curiae* American Wind Energy Association.

Panel

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices McLaren and Jorgensen concurred in the judgment and opinion.

## OPINION

¶ 1    The instant controversy arises from a wind energy system that was developed by GSG 7 and built on the property of Louis and Carol Vaessen. After the tower was completed, one of the subcontractors that worked on the tower, AUI Construction Group, LLC (AUI), filed a complaint to foreclose a mechanic's lien against the Vaessens' property and sought to recover over $3 million. The Vaessens filed a motion to dismiss the complaint, and Clipper Windpower, LLC (Clipper), a general contractor on the project, filed a motion for summary

- 2 -

judgment. Both motions asserted that the wind energy system remained GSG 7's personal property and was a nonlienable trade fixture rather than an improvement to the property. The circuit court of Lee County agreed and granted the Vaessens' motion to dismiss and Clipper's motion for summary judgment. AUI appeals from that order. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3     On June 29, 2007, Louis and Carol Vaessen entered into a windpark easement agreement with GSG 7, a developer of wind energy. Among other things, the easement provided GSG 7 the exclusive right "to erect, install, construct, replace, maintain, repair and operate wind energy conversion systems on the Property as Developer determined in its sole discretion." The agreement provided that the Vaessens would receive annual payments of $7500 upon erection of a wind turbine.

¶ 4     Following its agreement with the Vaessens, GSG 7 entered into an agreement with Clipper to supply the wind turbine and the tower to support that wind turbine. Clipper manufactured wind turbines but not the towers to support those turbines. Therefore, Clipper entered into a fixed-price contract with Postensa Wind Structures US, LLC (Postensa), for the construction of a prototype tower designed to support the wind turbine.

¶ 5     Postensa, in turn, entered into a cost-plus agreement with AUI for the construction of the foundation and tower. The Postensa-AUI agreement is dated November 3, 2011, but it was not executed until January 16, 2012, by AUI and until February 1, 2012, by Postensa. The recital to the agreement stated that Postensa had entered into an agreement with Clipper to design and build the foundation and tower for a wind-powered electrical generator facility that was owned by GSG 7. The Postensa-AUI agreement provided that the estimated total construction costs for AUI's scope of work would be $1,664,791.

¶ 6     A memorandum of the windpark easement agreement between the Vaessens and GSG 7 was recorded on December 22, 2011.

¶ 7     After AUI completed its work in March or May 2012, it claimed that the total amount due from Postensa was $5,904,272.69. After giving Postensa credit for various payments, AUI asserted that there remained an outstanding balance of $3,188,634.44. AUI filed an arbitration demand against Postensa for the approximately $3 million that it claimed it was still owed.

¶ 8     On June 25, 2013, the arbitrator entered a partial award. On August 20, 2013, Postensa filed for bankruptcy. On December 4, 2013, the arbitrator entered a final award in favor of AUI for $3,527,043 (including $655,839 in AUI's attorney fees and costs).

¶ 9     On April 17, 2014, AUI filed a complaint to foreclose a mechanic's lien against the Vaessens. AUI asserted that, because the materials, fixtures, services, and labor it furnished constituted a valuable and permanent improvement to the property, the Vaessens benefitted in an amount equivalent to the arbitration award. AUI further requested that the Vaessens' property be sold at public auction to satisfy its lien.

¶ 10    On June 23, 2014, the Vaessens filed a motion pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2014)) to dismiss AUI's complaint. On October 17, 2014, Clipper filed a motion for summary judgment. Both motions asserted that the wind energy system remained GSG 7's personal property and was a nonlienable trade fixture rather than an improvement to the property.

¶ 11    On April 15, 2015, the trial court granted the Vaessens' motion to dismiss and Clipper's motion for summary judgment. The trial court explained that mechanic's lien laws are based on the theory that an owner is benefitted by improvements that become part of his premises. As such, the owner should pay for this accruing benefit when the owner induced or encouraged the erection of the improvement. Relying on *Crane Erectors & Riggers, Inc. v. La Salle National Bank*, 125 Ill. App. 3d 658, 662 (1984), the trial court found that there were three factors to be considered in determining whether equipment has become a fixture to the realty and thus lienable. Specifically, those factors were (1) the nature of the equipment's attachment to the realty, (2) the equipment's adaptation to and necessity for the purposes to which the premises are devoted, and (3) whether it was intended that the equipment should be considered part of the real estate. After considering these factors, the trial court determined that GSG 7 retained ownership of the wind energy system according to the unambiguous terms of the easement and that AUI had notice of the terms of the easement through the recorded memorandum. The trial court expounded:

> "If AUI's mechanic's lien were allowed to attach to the real estate and GSG [7] chose to terminate the easement and removed all of its property brought onto the premises as allowed by the easement agreement,[1] the lien would remain upon the real estate after removal of the benefit upon which the lien was based. Therefore, to allow AUI's filing of a mechanic's lien to attach to the real estate where removal of the fixture is allowed would produce an absurd result not intended by the lien act."

¶ 12    On May 14, 2015, AUI filed a motion to reconsider. On December 11, 2015, the trial court denied that motion. AUI thereafter filed a timely notice of appeal.

¶ 13                                        ANALYSIS

¶ 14    On appeal, AUI argues that the trial court erred in granting the Vaessens' section 2-619 motion to dismiss their complaint and Clipper's motion for summary judgment. AUI insists that a question of fact remains as to whether the tower was a lienable land improvement as opposed to a nonlienable trade fixture. AUI further argues that the trial court erred in its consideration of factors that determine whether a structure is lienable.

¶ 15    The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proved issues of fact at the outset of litigation. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003). A section 2-619 motion admits as true all well-pleaded facts, along with all reasonable inferences that can be gleaned from those facts. *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 352 (2008). "[W]hen ruling on a section 2-619 motion to dismiss, a court must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party." *Id.* On appeal from a ruling on a section 2-619 motion, the reviewing court must consider whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law. *Thurman v. Champaign Park District*, 2011 IL App (4th) 101024, ¶ 18.

¶ 16    The purpose of a motion for summary judgment is to determine whether a genuine issue of triable fact exists (*People ex rel. Barsanti v. Scarpelli*, 371 Ill. App. 3d 226, 231 (2007)), and

---

[1]As will be discussed in more detail, *infra* ¶ 20, the Vaessen-GSG 7 agreement provided that, upon termination of the easement agreement, GSG 7 was obligated to remove the wind energy system from the Vaessens' property.

such a motion should be granted only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law" (735 ILCS 5/2-1005(c) (West 2014)). An order granting summary judgment should be reversed if the evidence shows that a genuine issue of material fact exists or if the judgment is incorrect as a matter of law. *Clausen v. Carroll*, 291 Ill. App. 3d 530, 536 (1997). We review *de novo* the trial court's grant of a motion for summary judgment. *Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 395 (2008).

¶ 17   The purpose of the Mechanics Lien Act (Act) (770 ILCS 60/0.01 *et seq.* (West 2014)) is to protect those who, in good faith, furnish material or labor for the improvement of real property. *Mostardi-Platt Associates, Inc. v. Czerniejewski*, 399 Ill. App. 3d 1205, 1209 (2010). The Act permits a lien upon property where a benefit has been received by the owner and where the value or condition of the property has been increased or improved by the furnishing of the labor or materials. *Id.* The Act is a comprehensive statute that outlines the rights, responsibilities, and remedies of parties to construction contracts, including owners, contractors, subcontractors, and third parties. *Cordeck Sales, Inc. v. Construction Systems, Inc.*, 382 Ill. App. 3d 334, 353 (2008). The burden of proving that each requirement of the Act has been satisfied is on the party seeking to enforce the lien. *Czerniejewski*, 399 Ill. App. 3d at 1209. Because the right to a mechanic's lien is statutory, a plaintiff must strictly comply with the Act. *Cordeck*, 382 Ill. App. 3d at 353. However, once a plaintiff has complied with the procedural requisites, the Act is liberally construed in order to accomplish its remedial purpose. *Weydert Homes, Inc. v. Kammes*, 395 Ill. App. 3d 512, 516 (2009).

¶ 18   The central question in this case is whether AUI's work constituted improvement to real property, which is lienable (*Czerniejewski*, 399 Ill. App. 3d at 1209), as opposed to improvement to a trade fixture, which is not (*B. Kreisman & Co. v. First Arlington National Bank of Arlington Heights*, 91 Ill. App. 3d 847, 852 (1980)). The factors to be considered in determining whether equipment added to property constitutes a land improvement and is thus lienable are: (1) the nature of its attachment to the realty, (2) its adaptation to and necessity for the purposes to which the premises are devoted, and (3) whether it was intended that the item in question should be considered part of the realty. *Crane Erectors*, 125 Ill. App. 3d at 662. Intent is the preeminent factor, the other considerations being primarily evidences of intent. *Id.* The fact that an item can be removed without material injury to the realty does not of itself destroy its lienability. *Id.* Further, that an item can be removed does not conclusively establish that it is a trade fixture where it is clear that there is an intent to permanently improve the property by its installation. See *Dual Temp Installations, Inc. v. Chicago Title & Trust Co.*, 41 Ill. App. 3d 415, 417-18 (1976). "Parties may, however, contract to evidence an intention that the title to chattels which become annexed to realty does not pass and that they retain their character as trade fixtures until paid for; this agreement is binding upon the parties to the agreement where no rights of third parties are unfairly affected." *Crane Erectors*, 125 Ill. App. 3d at 662 (citing *Jones v. Jos. Greenspon's Son Pipe Corp.*, 381 Ill. 615, 619-20 (1943)).

¶ 19   The first two factors suggest that the tower is lienable. As the trial court aptly stated:

> "The nature of the attachment of the [wind energy system (WES)] to the premises is considerable. The WES consists of a tower over 500 feet tall, [and a] turbine system attached to a foundation reaching nearly 12 feet below ground with power lines and roads. This form of attachment clearly suggests permanent attachment to the premises.

Secondly, the equipment is specific and necessary for the production of wind energy to which at least a portion of the premises [is] devoted."

¶ 20        As to the third factor, this factor strongly weighs in favor of finding that the parties intended that the tower was a trade fixture that would remain the property of GSG 7 and not become a land improvement. The easement agreement provides that all property installed by GSG 7 would remain the property of GSG 7 and would be removable by GSG 7 upon three months' notice to the Vaessens. The agreement further provides that GSG 7 could terminate the agreement upon three months' notice and that GSG 7 would dismantle and remove all improvement fixtures and property owned by GSG 7. As such, the agreement clearly demonstrates that the Vaessens and GSG 7 did not intend the tower to be a permanent land improvement. As the intent of the parties is the most important factor in determining whether an item is a removable trade fixture or a permanent improvement, the easement agreement establishes that the tower was a trade fixture. See *id.*

¶ 21        AUI insists that the easement should not be binding against it, because it performed $1.7 million in work before the windpark easement was recorded. AUI points out that in *Crane Erectors* the court determined that agreements would be binding only "where no rights of third parties are unfairly affected." *Id.* As its rights would be "unfairly affected" if we found that the easement affected its ability to file a lien on the Vaessens' property, AUI argues, we should find that it did not have timely notice of that easement

¶ 22        In making this argument, AUI would have us overlook its own contract with Postensa. That agreement provides in relevant part:

> "[Postensa] has entered an agreement with Clipper Windpower LLC ('Turbine Supplier') to design and build the foundation and tower ('Design-Builder's Work') for a wind-powered electrical generation facility known as the Eve project consisting of one (1) 2.5 MW wind turbine generator located in Sulette County, Illinois, USA (the 'Project') *and owned by GSG 7, LLC* ('Owner')." (Emphasis added.)

The Postensa-AUI contract states that the owner of the project upon which AUI would be working was GSG 7. In this important regard, the Postensa-AUI agreement mirrors the Vaessens-GSG 7 agreement in providing that the owner of the project was GSG 7, not the Vaessens.

¶ 23        Further, the Postensa-AUI agreement, dated November 3, 2011, predated the recording of the easement on December 22, 2011. There is no indication in the record that AUI performed any work on the project prior to November 3, 2011. Nor is there any reason to draw such an inference. As AUI had knowledge through its contract with Postensa that the work it would be performing would ultimately benefit GSG 7, it is not unfair to find that the agreement between the Vaessens and GSG 7—which provided the exact same thing—was binding on them as well. AUI points out that the trial court did not rely on AUI's contract with Postensa in determining that AUI had notice of the easement agreement. However, it is well settled that we may affirm on any basis appearing in the record. See *Burkhart v. Wolf Motors of Naperville*, 2016 IL App (2d) 151053, ¶ 23.[2]

---

[2]The American Subcontractors Association (ASA) has filed an *amicus curiae* brief in support of AUI's position. ASA argues that the trial court's decision is contrary to both the Act and public policy because AUI should not have been required to do a title search to determine the relationship between the Vaessens and GSG 7. We need not determine whether AUI should have conducted such a title

¶ 24    AUI further insists that there are other factors that the trial court should have considered as to the lienability of the tower beyond those enumerated by *Crane Erectors*. Those additional factors include: (1) whether the item provides any benefit or enhancement to the property; (2) whether the item is removable without material damage to the realty; (3) whether it is impractical to remove the item; (4) whether the item was used to convert the premises from one use to another; and (5) the agreement and relationship between the parties. AUI contends that, as no single factor is dispositive (*Crane Erectors*, 125 Ill. App. 3d at 662-64), the trial court should have found, considering all of the factors together, that the tower was in fact a lienable structure. The defendants respond that AUI is trying to "cherry-pick" from other cases and add factors that the trial court is simply not required to consider.

¶ 25    We believe that all of the additional factors that AUI argues the trial court should have considered are consistent with the ones enumerated in *Crane Erectors*, which the trial court did consider. All of the additional factors that AUI points to pertain to what the parties intended when they entered their contract. Again, as *Crane Erectors* stated, the parties' intent in forming their contract is the preeminent factor. *Id.* at 662.

¶ 26    Moreover, the consideration of these factors would not change our view. As to whether the tower provided a benefit to the Vaessens, we note that the Vaessens did not receive anything other than rent from GSG 7, which is not a benefit for purposes of the Act. See *L.J. Keefe Co. v. Chicago & Northwestern Transportation Co.*, 287 Ill. App. 3d 119, 122 (1997). In *L.J. Keefe*, the owner of the land underlying railway tracks granted a license to Commonwealth Edison Company to install power lines on its land. The plaintiff was retained to perform tunneling work to allow the installation of steel casing and pipe grouting for Commonwealth Edison Company and attempted to enforce a lien against the owner of the land. The court held that no lien is enforceable against the owner of the land when a subcontractor constructs or installs apparatus for a contractor's sole benefit and the work does not improve the land or benefit the landowner. *Id.* The court held that there was no contract to improve the land. *Id.* Rather, Commonwealth Edison Company had been granted a license to construct an apparatus for its own benefit, not for the benefit of the landowner. *Id.* The subcontractor's work was performed solely for the benefit of Commonwealth Edison Company and did not benefit the land or the landowner in any way. *Id.* The court specifically found that the rent that the landowner had received from Commonwealth Edison Company was "too attenuated to fall within the purview of the Act." *Id.*

¶ 27    We note that there is case law suggesting that whether construction provides a benefit to the property is the "central inquiry" in mechanic's lien cases. See *First Bank of Roscoe v. Rinaldi*, 262 Ill. App. 3d 179, 183 (1994). However, there is also case law that indicates that no single factor is dispositive in determining whether an item is a lienable improvement. See *Crane Erectors*, 125 Ill. App. 3d at 662-64. Regardless, we find that this factor weighs in favor of finding that the tower was not lienable.

¶ 28    Relying on *Crane Erectors*, AUI next argues that, because the removal of the tower would be impractical and cause damage to the property, these considerations weigh in favor of finding that the tower was a permanent improvement. Relying on *Jones*, 381 Ill. at 619-22, and *E.R. Darlington Lumber Co. v. Burton*, 156 Ill. App. 82, 86-87 (1910), Clipper responds that

---

search because, as explained above, in light of AUI's own contract with Postensa, AUI should have known that the Vaessens were not the owners of the project.

those considerations will not outweigh the parties' intent in building an item unless it is in fact impossible to remove the item.

¶ 29    In *Crane Erectors*, the plaintiff installed an overhead crane in the defendant's warehouse. After the plaintiff failed to receive payment for its work, the plaintiff sought to enforce its mechanic's lien claim against the defendant. The defendant argued that the crane was leased by its warehouse tenant, which prevented a lien claim against the defendant. The reviewing court considered numerous factors in determining that the crane had become a permanent fixture in the warehouse and that therefore a lien against the defendant was proper. Those factors included that (1) because the crane was very large, running the length of the warehouse, it would be impractical (but not impossible) to remove it; (2) the defendant, and not its tenant, had made payments to the plaintiff for the work done; and (3) the crane remained in the building after a transfer of ownership. *Crane Erectors*, 125 Ill. App. 3d at 660-64.

¶ 30    In *Jones*, the supreme court considered whether 1382 feet of well casing embedded and cemented into the ground for oil and gas extraction was a trade fixture. Evidence was presented that a bomb would have to be used to remove the casing. The appellate court determined that the casing constituted a permanent land improvement, but the supreme court reversed, explaining:

> "The Appellate Court clearly erred in holding that the appellant had no right to enter upon the leasehold premises and repossess the casing because the same had become embedded and cemented in the oil well. To so hold was, in effect, to transfer the title to the casing from the vendor to the vendee, through the act of the latter, in plain violation of the terms of the contract. ***

> * * *

> Since it appears that the landlord and [the lessee] agreed that the casing could be removed, we hold that the oil casing placed in the ground under such circumstances is a trade fixture as between the landlord and [the lessee]." *Jones*, 381 Ill. at 619, 621-22.

¶ 31    In *Darlington*, a landowner entered into an agreement to lease 160 acres of her land to be used as an amusement park. The agreement provided that the lease would be for five years and that all of the buildings or fixtures erected thereon would be removed at the end of the lease. After the buildings were erected and a dam put in to form a lake, the lessee defaulted in the payment of rent. Thereafter, the Darlington Lumber Company, which had furnished material for the structures, sought to enforce a mechanic's lien against the landowner on the basis that the improvements to the land were permanent. The reviewing court determined that a lien could not be enforced against those improvements that could be removed. However, as to the dam, the reviewing court stated:

> "It is obvious that such improvement could not be removed from the premises except at considerable expense, and without rendering the material used practically worthless, and totally destroying the lake. The privilege granted to remove such materials at the termination of the lease was therefore of no practical value or advantage to the lessee, and may be regarded as nugatory, and the improvement being incapable of removal necessarily inured to the owners of the fee of the premises. The [landowner] having authorized the erection of improvements which [she] must be held to have known to be of that character and which of necessity would remain upon the premises at the expiration of the lease, and thus inure to the benefit of the then owner of the fee, cannot

be permitted to invoke the removal clause in the lease to escape liability for the cost of the same." *Darlington*, 156 Ill. App. at 86-87.

¶ 32 From *Jones* and *Darlington*,[3] we can extrapolate that an improvement that the parties consider to be temporary will be found to be temporary unless that improvement really cannot be removed. To hold otherwise would essentially transfer ownership rights in the property when the parties themselves did not intend to transfer such rights. See *Jones*, 381 Ill. at 619. We note that this was part of the trial court's rationale in denying AUI's lien claim against the Vaessens.

¶ 33 Here, it is clear that the tower can be removed. AUI's president, Mario Carbone, testified that bombs would have to be used to remove the tower. We observe that this was the same method that would have been used to remove the well casing in *Jones*. Further, Carbone testified that it would cost over $600,000 to remove that tower.[4] Although expensive to remove, the tower was clearly not "incapable of removal." See *Darlington*, 156 Ill. App. at 87.

¶ 34 Moreover, we find AUI's reliance on *Crane Erectors* to be misplaced. Although that court indicated that one of the reasons it found that an overhead crane was a permanent fixture was that it would be impractical to remove it, the court also found pertinent two additional reasons not present here—that the landlord, rather than the tenant, had made payments to the contractor and that the crane remained in the building even after the ownership of the building had changed. It is apparent that the court's determination that the crane was a permanent improvement was based on the totality of those circumstances.

¶ 35 AUI additionally points out that the Vaessens-GSG 7 agreement provides that the tower will have a foundation installed 12 feet deep into the ground. However, upon termination of the easement, the agreement provides that only the top four feet of the foundation will be removed. AUI suggests that, as the foundation will not be completely removed, the improvement to the property is indeed permanent.

¶ 36 We note that AUI points to nothing in the record that suggests that leaving concrete buried 4 to 12 feet below the Vaessens' farmland will affect their use of the property. Rather, the record supports an inference that after the tower is removed the Vaessens will be able to resume farming on the land that was occupied by the tower. As such, this fact is consistent with the conclusion that the tower was not intended to be a permanent land improvement.

¶ 37 In sum, although it is clear that it will be expensive to remove the tower from the Vaessens' property, it is also evident that it is not impossible to do so. As such, this consideration does not outweigh the fact, reflected in the Vaessens-GSG 7 agreement, that the tower was intended to be temporary.

---

[3]As *Darlington* is an appellate court decision prior to 1935, it is not precedential. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 95 (1996). However, we may still consider it as persuasive authority.

[4]The Vaessens argue that "Carbone's opinions in his affidavit are unsupported expert opinions that cannot be considered at the summary judgment phase, because they would not be admissible at trial." Specifically, the Vaessens argue that "Carbone is not qualified to give expert testimony regarding removal of the [tower] from the Subject Premises, methods of removal, cost of removal, and whether the Subject Premises would be damaged by removal." We need not address this argument, because, even if we were to find that all of his testimony was admissible, it would not change the result.

¶ 38    As to the next factor that AUI argues the trial court should have considered—whether the item was used to convert the premises from one use to another—we find that this is equivalent to a factor that the trial court did consider—the item's adaptation to and necessity for the purposes to which the premises are devoted. The trial court found that, because a portion of the premises was converted from farmland to harnessing wind energy, this factor weighed in favor of finding that the tower was lienable.

¶ 39    The fifth additional factor—the Vaessens-GSG 7 agreement—as we have already discussed extensively, weighs heavily in favor of finding that the tower was not a lienable structure. Thus, even considering these additional factors, it is readily apparent that Vaessens and GSG 7 did not intend the tower to be a permanent improvement.

¶ 40    AUI further contends, however, that beyond the factors listed above, there are other factors—specific to this case—that warrant a finding that the tower was a lienable object. Specifically, AUI argues that (1) the Vaessens-GSG 7 agreement expressly contemplated lienable work, (2) Illinois law treats wind energy devices as taxable real property, and (3) AUI's construction agreement with Postensa contemplated lienable work. We do not believe that any of those considerations warrants a different result.

¶ 41    AUI points to paragraph 5.3 of the Vaessens-GSG 7 agreement, which requires GSG 7 to "keep Owner's interest in the Property free and clear of all liens and claims of liens for labor and services performed on, and materials, supplies and equipment furnished to the Property in connection with Developer's use of the Property." AUI also asserts that the Vaessens-GSG 7 agreement provides for the construction of "improvements," "facilities," and "real property." AUI contends that these provisions demonstrate that the Vaessens and GSG 7 contemplated that the construction of the tower would constitute lienable work. We disagree. The plain language of these provisions indicates the exact opposite: that the Vaessens contemplated that there would be no liens placed on their property based on GSG 7's development of a wind energy system.

¶ 42    As to the tax consequences of the wind energy system, AUI argues that Illinois's tax treatment of wind energy devices weighs heavily in favor of finding that the tower is an improvement on real estate and not a trade fixture. AUI asserts that, under the Property Tax Code (35 ILCS 200/1-1 *et seq.* (West 2014)), the property tax valuation of a wind energy device is based on the "real property cost basis" of "the land and real property improvements of a wind energy device," valued at $360,000 per megawatt of nameplate capacity, minus an allowance for physical depreciation, and with adjustments for inflation. See 35 ILCS 200/10-600, 10-605 (West 2014).

¶ 43    In response, Clipper argues that the Property Tax Code does not treat a wind energy device as a fixture to the owner's land. Clipper asserts that, because Illinois does not have a general personal property tax, and because it does not want to permit multimillion-dollar turbines to escape all taxation, it imposes a real property tax on a wind energy device, but only after isolating the wind energy device from the land. See 35 ILCS 200/10-620 (West 2014). Pursuant to section 10-620 of the Property Tax Code, the owner of the wind energy device must have a land surveyor prepare a plat of the area of the device and that plat is then issued its own parcel identification number so that the device may be separately taxed. Clipper argues that section 10-620's approach to taxing wind turbines is entirely consistent with the Vaessens-GSG 7 agreement, which requires GSG 7 to pay taxes associated with the wind development project that GSG 7 continues to own after the installation.

¶ 44    We agree with Clipper's interpretation of section 10-620 of the Property Tax Code. There is nothing in that provision, or any other provision of the Property Tax Code, that suggests that a wind turbine that is installed on property is considered to be a permanent improvement to the land. Rather, the fact that the Illinois General Assembly added a specific section to the Property Tax Code to cover wind turbines suggests that it was concerned that those wind turbines would not otherwise be taxed, because they are not land improvements.

¶ 45    As to AUI's argument that its construction agreement with Postensa contemplated lienable work, we note that AUI cites no authority as to why that fact should even have a bearing in this case. Absent any such authority or cogent analysis of why this fact is relevant, this fact does not require us to reach a different result. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013).

¶ 46    Finally, we note that an *amici curiae* brief has been filed in support of AUI's position by the Associated General Contractors of America, Builders Association, Central Illinois Builders of AGC, Fox Valley Associated General Contractors, and Southern Illinois Builders Association (collectively referred to as AGC). AGC argues that the trial court's ruling is contrary to both Illinois law and public policy that prohibit no-lien construction contracts and projects. Specifically, AGC contends that the Act prohibits construction contracts that require contractors or subcontractors to waive their lien rights "in anticipation of and in consideration for the awarding of a contract or subcontract." 770 ILCS 60/1(d) (West 2014).

¶ 47    AGC's argument is flawed because there is no contractual language here that requires contractors to waive their lien rights.[5] AGC implicitly recognizes this, as it instead asserts that the trial court's ruling had the effect of resurrecting the no-lien contracts that the Illinois General Assembly prohibits. We disagree. The trial court's decision was based on Illinois jurisprudence that trade fixtures are not subject to mechanic's liens. AGC essentially asks that we disregard that law and find that even trade fixtures are subject to mechanic's liens. This argument should be directed at the Illinois General Assembly, not this court.

¶ 48    AGC next argues that the trial court erred in finding that AUI could have filed a lien against GSG 7 pursuant to the Uniform Commercial Code (UCC). AGC contends that UCC security interests simply do not exist "in ordinary building materials incorporated into an improvement on land." 810 ILCS 5/9-334(a) (West 2014). As AUI built the wind structure with concrete, rebar, electrical conduit, and other "ordinary building materials," the UCC does not apply. AGC therefore argues that AUI should have been allowed to file a mechanic's lien against the Vaessens' fee simple interest in the land.

¶ 49    We do not disagree with AGC's assertion that AUI does not have any basis to file a UCC lien against GSG 7. However, that does not mean we should ignore the above-discussed precedent and find that AUI should be allowed to maintain a mechanic's lien against the Vaessens instead.

¶ 50    AGC's final argument is that the trial court failed to recognize AUI's separate and distinct mechanic's lien rights against GSG 7's interest in the land. AGC argues that, under section 1(a) of the Act, a mechanic's lien "extends to an estate in fee, for life, for years, or any other estate or any right of redemption or other interest which the owner may have in the lot or tract of land at the time of making such contract or may subsequently acquire." 770 ILCS 60/1(a) (West

---

[5]As discussed earlier, the Vaessens-GSG 7 agreement provided that GSG 7 was to ensure that no liens were placed on the Vaessens' property. However, as that contract was between a landowner and a developer, it is not contrary to any of the provisions of the Act.

2014). Under section 21(a), a subcontractor has a lien "on the same property as provided for the contractor." 770 ILCS 60/21(a) (West 2014). AGC contends that it therefore follows that AUI's mechanic's lien extended to GSG 7's interest in the land, as set forth in AUI's lien claim and complaint to foreclose.

¶ 51 In making this argument, AGC argues that GSG 7's interest in the land, "while cloaked as an easement, is in substance a long-term leasehold interest." AGC primarily points to the fact that the agreement could last 50 years as the reason why the agreement should be treated as a lease rather than an easement. AGC seeks to reclassify the agreement as a lease because, although leases may be subject to mechanic's liens (*Hacken v. Isenberg*, 288 Ill. 589 (1919)), easements clearly are not. See *Matanky Realty Group, Inc. v. Katris*, 367 Ill. App. 3d 839 (2006). In *Matanky*, the reviewing court explained:

> "An easement provides a right or privilege in the use of another's property. [Citation.] An easement qualifies as appurtenant when the user of the right enjoys a dominant estate over the used land, which is considered the servient estate. [Citation.] The individual with the easement is entitled to the necessary use of the easement. [Citation.] Accordingly, the easement provides use rights; however, it does not provide ownership rights or an ownership interest in the land. As a result, defendants cannot be considered owners of the [land at issue] or any portion thereof merely because they have rights under the easement." *Id.* at 842.

¶ 52 Here, as explained earlier, the Vaessens-GSG 7 agreement provided that it could last as little as three months. This mitigates against a finding that the agreement was in reality a lease. Further, as the trial court noted, finding that AUI could place a lien on the Vaessens' land even if GSG 7 were to remove the tower would be inequitable and contrary to the plain language of the Act.[6]

¶ 53                                CONCLUSION
¶ 54 For the reasons stated, we affirm the decision of the circuit court of Lee County.

¶ 55 Affirmed.

---

[6]We note that both AUI and AGC argue that, although AUI seeks to place a lien on the Vaessens' property, the Vaessens' farm will not be subject to foreclosure because GSG 7 agreed to indemnify the Vaessens. Therefore, GSG 7, not the Vaessens, will be ultimately liable to pay AUI. Although that might be true (assuming GSG 7 does not itself file for bankruptcy), there is nothing in the Act that permits a contractor to obtain a lien against a landowner simply because that landowner has an indemnity agreement with a developer. We decline AUI and AGC's implicit invitation to expand the Act to allow a lien to be placed against a landowner in such a situation. See *Inter-Rail Systems, Inc. v. Ravi Corp.*, 387 Ill. App. 3d 510, 516 (2008) (mechanic's liens should not be extended to cases not provided for by the language of the Act even though they might fall within its reason).